579 So.2d 1039 (1991)
LAKESHORE PROPERTY OWNERS ASSOCIATION, INC.
v.
Walden J. DELATTE.
No. 90-CA-0253.
Court of Appeal of Louisiana, Fourth Circuit.
April 16, 1991.
Rehearing Denied June 18, 1991.
*1040 Victoria Lennox Bartels Wessel, Bartels & Ciaccio, New Orleans, for plaintiff.
Anthony S. Taormina, Metairie, for defendant.
Before GARRISON, BYRNES and WILLIAMS, JJ.
WILLIAMS, Judge.
In this case, defendant Walden J. Delatte appeals from a judgment rendered against him and in favor of plaintiff Lakeshore Property Owners Association, Inc. The judgment enjoins him "from increasing the use of his residence located at 528 Topaz Street in Western Lakeshore Subdivision beyond the 2,310 feet maximum coverage..." and further enjoins him "from increasing the combined use area of his residence and garage beyond the 2,510 feet maximum provided in Section VI of the Restrictive Covenants affecting said residence."[1] Delatte claims the trial court erred in issuing the injunction because the building restrictions on lot coverage affecting his residence are invalid or, alternatively, have been abandoned. As we disagree with Delatte's assertions, we affirm.

POSTURE OF THE CASE
On September 5, 1986, the Lakeshore Property Owners Association filed a petition for mandatory and injunctive relief against Delatte because his proposed garage allegedly violates Sections II and VI of the building restrictions recorded in the Orleans Parish conveyance records and noted in his title. Section VI of the restrictions limit construction to 30% lot coverage. As proposed, Delatte's garage would create an 81 foot violation.
Delatte answered the petition and filed a reconventional demand which claimed past discriminatory enforcement of the restrictions. Subsequently, he filed a peremptory exception raising the objections of no right of action, no cause of action, prescription and res judicata. The exception was overruled on October 13, 1986. Following trial, the court rendered judgment on December 22, 1986, permanently enjoining Delatte from constructing his proposed garage and dismissing his reconventional demand. Delatte appealed.
In Lakeshore Property Owners Ass'n, Inc. v. Delatte, 524 So.2d 126 (La.App. 4th Cir.1988), a panel of this court recognized that a plaintiff seeking an injunction must establish a violation of a restriction before the burden shifts to the defendant to prove termination or abandonment of the restriction. 524 So.2d at 129. The panel held the Association met its burden by showing Delatte's proposed garage violated the restriction. Consequently, the burden shifted to Delatte to prove termination or abandonment of the restriction by a preponderance of the evidence. 524 So.2d at 130. Nevertheless, as the trial court committed reversible error by failing to consider the Gerrets case, a case in which the Association unsuccessfully attempted to enforce the same building restriction against another owner, the panel did not determine whether Delatte *1041 met his burden. Instead, the judgment was reversed and the case was remanded for consideration of all relevant evidence on the issue of abandonment. 524 So.2d at 132.
On remand on June 28, 1988, the parties stipulated that Lakeshore Subdivision is divided into two halves, East and West Lakeshore Subdivisions, geographically divided by Canal Boulevard from Robert E. Lee Boulevard to Lake Pontchartrain, that Delatte is the owner and resident of 528 Topaz Street in West Lakeshore Subdivision, that he purchased 528 Topaz subject to building restrictions, "that construction of the garage as intended would be a violation of Section VI of the building restrictions as written, if said Section VI of the building restrictions is legally valid and/or has not been abandoned," that in 1955 a new set of building restrictions was created for the Eastern half of Lakeshore Subdivision, that the new restrictions did not contain a provision limiting coverage to 30% and no attempt has been made since 1955 to enforce 30% maximum coverage on any residence in East Lakeshore Subdivision, and that Lot 17, Square 7 and Lot 15, Square 7 are two properties in West Lakeshore Subdivision which bear improvements in violation of the 30% maximum coverage provision of Section VI. The parties also stipulated that if each of the witnesses who appeared at the first trial were called again to testify, they would give their previous testimony, and that the documents admitted into evidence at the first trial, the entire record of Lakeshore Property Owners Ass'n, Inc. v. Gerrets, C.D.C. No. 6045-451, the survey of Lakeshore Subdivision and the letter of Omer Kuebel, are exhibits.
After introducing the stipulation, the Association rested its case in chief based upon Delatte's concession that construction of his proposed garage is a violation of Section VI of the building restrictions. To meet the shifted burden of proof, Delatte introduced Kuebel's letter, the record of Lakeshore Property Owners Ass'n, Inc. v. Gerrets, and his exhibits from the first trial. He also introduced a survey of West Lakeshore Subdivision, exhibit D-6, marked to show violations of Section VI. The survey indicates the four violations shown in the Gerrets case, the two violations stipulated in joint exhibit 1, Kuebel's contested violation at 532 Crystal Street (Lot 14, Square 8), and Delatte's violation at 528 Topaz Street.[2]
Thereafter, the court rendered judgment in favor of the Association, and permanently enjoined Delatte from constructing his proposed garage. The court found the six stipulated violations together with one contested violation, insufficient proof of abandonment of the 30% coverage restriction. From the written judgment signed on June 29, 1989, Delatte filed this devolutive appeal.

LEGAL PRECEPTS ON BUILDING RESTRICTIONS
Prior to 1977, Louisiana law on building restrictions was a creature of jurisprudence. Acts 1977, No. 170, Expose des Motifs; LSA-C.C. art. 775, Comment (b). However, Acts 1977, No. 170, effective January 1, 1978, revised Title V of Book II of the Louisiana Civil Code of 1870, by repealing Articles 823 through 855 on fixing limits and surveying lands, and by enacting articles 775 through 783 on building restrictions.[3] This revision classified building restrictions as sui generis real rights akin to predial servitudes. Expose des Motifs, supra; LSA-C.C. art. 775, Comment (c); Yiannopoulos, Louisiana Civil Law Treatise, Vol. II, Sect. 161 (1980); Edwards v. Wiseman, 198 La. 382, 3 So.2d 661 (1941) [building restriction clauses constitute real rights running with the land]; Camelot Citizens Ass'n v. Stevens, 329 So.2d 847 (La.App. 1st Cir.1976), writ den., 333 So.2d 242 (La.1976).
Building restrictions are now regulated by LSA-C.C. arts. 775 through 783 and by "application of the rules governing predial *1042 servitudes to the extent that their application is compatible with the nature of building restrictions." LSA-C.C. art. 777; Yiannopoulos, supra.
Unlike predial servitudes, building restrictions may be imposed even in the absence of a dominant estate. LSA-C.C. art. 775, Comment (c). To create building restrictions as sui generis real rights, the owner(s) of the immovable(s) must impose charges governing building standards, specified uses, and improvements, in pursuance of a general plan which is feasible and capable of being preserved. Id.; LSA-C.C. art. 775; LSA-C.C. art. 776. The building restrictions must be created by title (juridical act) and, in order to be effective against third persons, must be recorded. LSA-C.C. art. 776, Comment (d).
Building restrictions may be enforced by mandatory and prohibitory injunctions without regard to the limitations of LSA-C. C.P. art. 3601. These actions to protect and enforce may be brought against any violator by the persons entitled to the property rights.[4] LSA-C.C. art. 779, Comment (b) citing Willis v. New Orleans East Unit of Jehovah's Witnesses, Inc., 156 So.2d 310, 313 (La.App. 4th Cir.1963), writ den., 245 La. 88, 157 So.2d 232 (1963); Edwards v. Wiseman, supra [building restriction clauses constitute real rights, not personal to the vendor, and inure to the benefit of all other grantees]. Consequently, as every landowner in a subdivision which is subject to building restrictions is adversely affected by violations of the restrictions, each has a substantive right as well as procedural standing to enforce the subdivision's building restrictions. LSA-C.C. art. 779, Comment (c). See also Camelot Citizens Ass'n v. Stevens, supra [building restrictions are valid and enforceable where inserted in deeds in pursuance of a general plan devised by the ancestor to maintain certain building standards; such restrictions inure to the benefit of all other grantees under a general plan of development and are real rights running with the land, which the grantees or their successors in title may enforce by injunctive proceedings].
Building restrictions terminate as provided in the act that establishes them. LSA-C.C. art. 780. In the absence of such provision, if the building restrictions have been in effect for at least fifteen years the restrictions may be amended or terminated for the whole or a part of the restricted area by agreement of owners representing more than one-half of the land area affected by the restrictions, or if the restrictions have been in effect for more than ten years the restrictions may be amended or terminated for the whole or a part of the restricted area by agreement of both owners representing two-thirds of the land area affected and two-thirds of the owners of the land affected by the restriction. LSA-C.C. art. 780, as amended by Acts 1980, No. 310, and Acts 1983, No. 129.[5]
*1043 No action for injunction or for damages on account of the violation of building restrictions may be brought after two years from the commencement of the noticeable violation. LSA-C.C. art. 781; former LSA-R.S. 9:5622. After the lapse of this period, the immovable on which the violation occurred is freed of the restriction that has been violated. This two-year liberative prescriptive period does not merely bar actions for the enforcement of building restrictions as sui generis real rights; rather, it extinguishes the real right itself in the same way that prescription of nonuse extinguishes the right of a servitude. LSA-C.C. art. 781, Comment (b). Upon completion of the prescription, the restriction is treated as if it never existed on that particular piece of land. LSA-C.C. art. 781, Comment (c), referencing Edwards v. Wiseman, supra.
Prescription of one type of restriction on a particular lot, however, does not free that lot from other restrictions nor other lots from restrictions of the type that has been violated, unless there has been a general abandonment of the restrictive plan or of particular restrictions. LSA-C.C. art. 782; LSA-C.C. art. 781, Comment (d), referencing Edwards v. Wiseman, supra; Olivier v. Berggren, 136 So.2d 325 (La.App. 4th Cir.1962); Sherrouse Realty Co. v. Marine, 46 So.2d 156 (La.App. 2d Cir.1950). Nevertheless, when the entire restrictive plan is abandoned, the affected area is freed of all building restrictions. LSA-C.C. art. 782. When a particular restriction is abandoned, the affected area is freed of that restriction only. Id.
Abandonment of the entire restrictive plan is ordinarily predicated on a great number of violations of all or most restrictions. LSA-C.C. art. 782, Comment (b). Abandonment of a particular restriction is predicated on a sufficient number of violations of that restriction in relation to the number of lots affected by it. Id.; Marquess v. Bamburg, 188 So.2d 721 (La.App. 2d Cir.1966); Guyton v. Yancey, 240 La. 794, 125 So.2d 365 (1960).
Whether a general waiver or relinquishment of a restriction has occurred by common consent or universal acquiescence, depends upon the facts of each case. Edwards v. Wiseman, supra. Where violations are general or have been universal without protest, so as to substantially defeat the object of the general scheme or purpose of the building restrictions, the restriction is considered waived or relinquished and cannot subsequently be enforced. See Id.; Antis v. Miller, 524 So.2d 71 (La.App. 3d Cir.1988); Marquess v. Bamburg, supra; Robinson v. Donnell, 374 So.2d 691 (La.App. 1st Cir.1979), writ den., 375 So.2d 958 (La.1979); Cook v. Hoover, 428 So.2d 836 (La.App. 5th Cir.1983).
Whether acquiesence to violations is sufficient to cause abandonment of a restriction depends upon the character, materiality and number of the violations and their proximity to the objecting residents. Guyton v. Yancey, supra; Gwatney v. Miller, 371 So.2d 1355 (La.App. 3d Cir. 1979); Ritter v. Fabacher, 517 So.2d 914 (La.App. 3d Cir.1987); East Parker Properties, Inc. v. Pelican Realty Co., 335 So.2d 466 (La.App. 1st Cir.1976), writ den., 338 So.2d 699 (La.1976). When frequent and substantial violations of a restriction pass without objection, the restriction is regarded as abandoned if the property owner against whom abandonment is asserted knew, should have known or had a duty to know of the alleged violation. East Parker Properties, Inc. v. Pelican Realty Co., supra. See also Lakeshore Property Owners Ass'n v. Delatte, supra. Insubstantial, technical or infrequent violations of a restriction, which are not subversive to the general plan or scheme, weigh little towards establishing an abandonment. Id.; Guyton v. Yancey, supra; Marquess v. Bamburg, supra; Cook v. Hoover, supra; Gwatney v. Miller, supra; Antis v. Miller, supra.
Doubt as to the existence, validity or extent of building restrictions is resolved in favor of the unrestricted use of the immovable. LSA-C.C. art. 783; Camelot Citizens Ass'n v. Stevens, supra; Salerno v. De Lucca, 211 La. 659, 30 So.2d 678 (1947).

*1044 APPLICATION OF PRECEPTS TO THE FACTS

A. The Association's Right of Action
Delatte contends the Association does not have standing to enforce the recorded restrictive covenants affecting West Lakeshore Subdivision because the restrictions are personal and not property rights. We disagree. The restrictions are sui generis real rights and every landowner in West Lakeshore Subdivision, as well as an association composed of those landowners, has a substantive right and procedural capacity to enforce West Lakeshore Subdivision's building restrictions.
The peremptory exception raising the objection of no right of action is the proper devise for challenging a plaintiff's interest in judicially enforcing the right asserted. Teachers' Retirement System of Louisiana v. Louisiana State Employees' Retirement System, 456 So.2d 594 (La. 1984). The want of interest raised by the objection relates primarily to whether the particular plaintiff falls as a matter of law within the general class in whose favor the law grants the cause of action asserted by the suit. Id., citing Bielkiewicz v. Rudisill, 201 So.2d 136 (La.App. 3d Cir.1967). The factual evidence admissible on the objection is restricted to evidence on whether this particular plaintiff does or does not fall within the general class having a legal interest to sue upon the cause of action asserted. Id.
The Articles of Incorporation for the Lakeshore Property Owners Association, Inc.,[6] set forth that its membership shall be composed of two types, owner members who are owners of real estate in Lakeshore Subdivision, and associate members who are residents in Lakeshore Subdivision and/or lessees of business establishments in Lakeshore Subdivision who are not owners. The articles also set forth, in part, the purposes for which the non-profit corporation is formed are "... to strive for the enforcement of building and other legal restrictions as contained in the titles to land in Lakeshore Subdivision; to require prospective builders in Lakeshore to strictly adhere to the said restrictions ..."
The building restrictions applicable to West Lakeshore Subdivision are sui generis real rights. Lakeshore Property Owners Ass'n, Inc. v. Delatte, supra. As such, the individual landowners in West Lakeshore Subdivision have the right to bring an action to enjoin Delatte from violating the subdivision's building restrictions. See Official Comments to LSA-C.C. art. 779; Yiannopoulos, supra, sect. 161 ["The owner of an immovable in a subdivision has always been able to protect and enforce his real rights against other owners of immovables burdened with correlative real obligations, and vice versa."]. Likewise, the Association which is composed of Lakeshore Subdivision's property owners and residents, has procedural capacity to sue to enforce the subdivision's building restrictions. See Ramsey River Road Property Owners Ass'n, Inc. v. Reeves, supra; Camelot Citizens Ass'n v. Stevens, supra.
Consequently, as the Association has a legal interest in the subject matter of this litigation, the trial court did not err in denying Delatte's peremptory exception raising the objection of no right of action.

B. Abandonment of Section VI in West Lakeshore Subdivision
The building restrictions adopted for the area designated as Lakeshore Subdivision and recorded in the conveyance records of Orleans Parish on February 29, 1952, describe the area bounded by Lake Pontchartrain on the North, Orleans Canal on the East, Robert E. Lee Boulevard on the South and New Basin Canal on the West. The description encompasses the areas known as East and West Lakeshore Subdivisions. Delatte claims that after the Board of Commissioners of the Orleans Levee District (Board) developed and sold lots in the western portion of Lakeshore Subdivision, it filed in the conveyance *1045 records a second set of building restrictions on July 28, 1955, affecting only the undeveloped, eastern portion of Lakeshore Subdivision. Delatte claims the second set of restrictions were adopted by the Board without amending, terminating, or revoking the first set of restrictive covenants and without obtaining the consent of the landowners who had purchased lots in the western portion of Lakeshore Subdivision.
He claims the Board's actions violate LSA-C.C. arts. 776 and 780 (1977 rev.). Specifically, he claims that because the 1952 restrictions do not contain a termination provision, the restrictions could not be terminated until 15 years had elapsed and until owners representing one-half of the land area affected agreed upon the termination. See LSA-C.C. art. 780 (1977 rev.). He also claims that the 1955 restrictions are invalid, because building restrictions may only be established by juridical act executed by all owners of the affected immovable, and lot purchasers such as Delatte's predecessor-in-title, did not execute or authorize the 1955 restrictions. See LSA-C.C. art. 776 (1977 rev.).
We disagree with Delatte and do not find LSA-C.C. arts. 776 and 780 controlling.
First, the restrictions on termination contained in LSA-C.C. art. 780 were not in effect in 1955. Prior to its enactment in 1977, the substance of LSA-C.C. art. 780, relative to the termination of building restrictions, was contained in LSA-R.S. 9:5622.[7]See note 5, supra. Although LSA-R.S. 9:5622 was originally enacted in 1938, the portion allowing for the termination of a building restriction based upon the agreement of one-half of the owners of the land affected by the restrictions, if 15 years had elapsed since the establishment of the restrictions, was enacted in 1960. Acts 1960, No. 448; Id. Therefore, in 1955, the provisions of LSA-R.S. 9:5622 would not have prevented the Board, which owned 100% of the eastern portion of Lakeshore Subdivision, from terminating the 1952 restrictions as to that portion of the subdivision.
Second, questioning the validity of the creation of the 1955 restrictions for East Lakeshore Subdivision under LSA-C.C. art. 776, is not relevant to the issue of the abandonment of Section VI of the 1952 restrictions in West Lakeshore Subdivision.
Restrictions may be rendered unenforceable in a particular area due to abandonment in that geographical area or neighborhood, without causing a general or universal abandonment throughout the subdivision. See Guyton v. Yancey, supra; Finn v. Murphy, 72 So.2d 358 (La. App.Orl.1954); Lamana-Panno-Fallo, Inc. v. Heebe, 352 So.2d 1303 (La.App. 4th Cir.1977). The parties stipulated that Lakeshore Subdivision is divided into two halves, East and West Lakeshore Subdivisions, geographically divided by Canal Boulevard. Thus, whether, in the eastern portion of Lakeshore Subdivision, the 1952 restrictions have been terminated, abandoned or extinguished by liberative prescription of two years does not establish the termination, abandonment, or extinguishment of the 1952 restrictions in the western portion of Lakeshore Subdivision. Instead, whether a sufficient number of violations exist so as to cause an abandonment of Section VI depends upon the character, materiality and number of violations in West Lakeshore Subdivision and whether the Association knew or should have known of these violations. Guyton v. Yancey, supra; Gwatney v. Miller, supra.
The Association claims that although it has stipulated to 6 violations and 1 contested violation of Section VI, Delatte failed to show the Association's knowledge of the violations before the restriction was extinguished on those immovables by liberative prescription. As a consequence, the Association claims none of the 6 violations may be considered to prove abandonment because the threshold requirement of proof of plaintiff's knowledge has not been met. We agree. An essential element of Delatte's *1046 abandonment claim is proof of the Association's relinquishment of the restriction by common consent or universal acquiescence. East Parker Properties, Inc. v. Pelican Realty Co., supra; Lakeshore Property Owners Ass'n, Inc. v. Delatte, supra. Without evidence showing the Association's timely knowledge of and lack of protest to the violations, Delatte could not prove the Association sufficiently acquiesced to the violations to cause an abandonment of the restriction.
Nevertheless, even if Delatte had introduced evidence illustrating the Association voluntarily acquiesced to the violations,[8] he would not have prevailed on his claim of abandonment. Assuming the 7 violations of Section VI are not insubstantial or technical, the comparatively few number of violations in relation to the 267 lots in West Lakeshore Subdivision, do not establish a general waiver of the restriction. Cf. Antis v. Miller, supra. The few number of violations do not establish a subversion of the Board's original building scheme or an alteration of the character of West Lakeshore Subdivision. See Gwatney v. Miller, supra; East Parker Properties, Inc. v. Pelican Realty Co., supra, n. 12.
Delatte's final claim, that West Lakeshore Subdivision's building restrictions automatically prescribed in 1981 or 1982 as a result of liberative prescription of 30 years, citing LSA-C.C. art. 3548 (repealed), is without merit. The termination, abandonment and extinguishment by liberative prescription of building restrictions, is governed by LSA-C.C. arts. 775 through 783.
For the reasons assigned, we affirm the judgment of the trial court. All costs are to be assessed against appellant.
AFFIRMED.
NOTES
[1] Section VI of the Building Restrictions Applying to West Lakeshore Subdivision provides as follows:

Lot Coverage:
No residence shall cover more than thirty per cent (30%) of the total area of the building site. In computing the coverage, the ground floor area of a one-story garage, whether attached or detached from dwelling, may be deducted from the building area, but not to exceed two hundred (200) square feet.
[2] The Association confirmed that it was stipulating to six violations of Section VI in western Lakeshore Subdivision.
[3] The subject matter of former Title V is now contained in Title VI, Boundaries, consisting of Articles 784 through 796.
[4] Violators may be forced to cease activities in contravention of the restrictions or to remove objectionable structures. LSA-C.C. art. 779, Comment (d) citing Salerno v. De Lucca, 211 La. 659, 30 So.2d 678 (1947).
[5] Article 780, as enacted in 1977, reproduced the substance of LSA-R.S. 9:5622. LSA-C.C. art. 780, Comment (a). Acts 1977, No. 170, Sect. 8, repealed LSA-R.S. 9:5622.

The history of LSA-R.S. 9:5622 is as follows: The statute was first enacted by Acts 1938, No. 326, and provided that all actions to enjoin or to obtain damages for the commission or continuance of a violation of restrictions contained in the title to land must be brought within 2 years from the commission of the violation. Acts 1960, No. 448 added, in part, the provision that if no provision in the restrictions is made for the termination of the restrictions, the restrictions could be terminated by "agreement of owners of a majority of the square footage of the land in said subdivision to terminate and end said restrictive covenants as of a definite date, provided said agreement will not be effective unless said restrictive covenants will have been established a minimum of 15 years prior to the date of termination of said restrictive covenants." Acts 1976, No. 210, amended the statute to provide for a period of liberative prescription to be applied prospectively and retrospectively for actions brought to challenge the validity of agreements of owners of lots in subdivisions to terminate restrictive covenants.
Thus, after 1960, LSA-R.S. 9:5622 provided for the amendment of restrictions, after the restrictions had been in effect for 15 years, but never provided for the amendment of restrictions after the restrictions had been in effect only 10 years.
[6] LSA-R.S. 12:207 specifically sanctions suits by non-profit corporations. See Ramsey River Road Property Owners Ass'n, Inc. v. Reeves, 387 So.2d 1194 (La.App. 1st Cir.1980), aff'd, 396 So.2d 873 (La.1981).
[7] Act 1977, No. 170, sect. 7 provides: The provisions of this Act shall apply to all building restrictions, including those existing on the effective date of this Act; but no provision may be applied to divest already vested rights or to impair the obligations of contracts.
[8] The trial record reveals the Association did not know of one violation until shortly before the trial of this case on remand. Another violation was the subject of the Gerrets suit, which the Association unsuccessfully sued to enjoin.